VME AMERICAS, INC. and Akerman, Inc., Plaintiffs,

v.

HEIN–WERNER CORPORATION, Defendant.

No. 95–C–596.

United States District Court, E.D. Wisconsin.

Oct. 8, 1996.

David J. Edquist, von Briesen, Purtell & Roper, Milwaukee, WI, for Plaintiffs.

Maurice J. McSweeney, Trevor J. Will, Linda E. Benfield, Paul Bargren, Benn S. Dipasquale, Foley & Lardner, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the court on defendant's motion for partial summary judgment. For the following reasons, the motion is granted-in-part and denied-in-part.

## FACTS [1]

This action concerns property located at 1005 Perkins Avenue, Waukesha, Wisconsin ("the Site" or "the Property"). (DFOF at ¶ 2.) The Site includes two parcels, referred to as the "east" and "west" parcels, on either side of an unnamed creek. (DFOF at ¶ 3.) Both parcels have been the subject of an environmental cleanup, but it is the contamination and cleanup of the east parcel which forms the basis of this lawsuit. At all times material hereto, the east parcel was undeveloped, about 8 acres in size, and accessible only via a private bridge extending from the west parcel. (DFOF at ¶¶ 4–5.) It was bordered by additional undeveloped land, a salvage yard, and a manufacturing site. (Id.)

On August 26, 1981, the defendant, Hein–Werner Corporation (Hein–Werner"), entered into an Asset Purchase Agreement ("the Agreement") for the sale of the Site to Akermans Verkstad AB, a Swedish Corporation, and the property was so deeded on Nov. 2, 1981. (DFOF at ¶ 6.) On that same day, Akermans Verkstad assigned its rights and obligations under the Agreement to plaintiff Akerman, Inc., a wholly owned subsidiary of

Akermans Verkstad. (Id.) Akermans Verkstad was subsequently acquired by the VME Group, N.V. and changed its name to VME Excavators AB. (Id.) The plaintiff, VME Americas, Inc. ("VME"), is a wholly owned subsidiary of VME Group N.V. (Id.)

In or around early spring of 1992, VME decided to sell the Site. (DFOF at ¶ 7.) To that end, in or around July of 1992, VME contracted with Versar, Inc ("Versar") to conduct a "Phase I" environmental assessment of the Site. (DFOF at 9; Bargren Aff., Ex. 4.) The purpose of the assessment was to "identify potential environmental impairment concerns related to past and present activities and current conditions" at the Site. (Bargren Aff., Ex. 4 at 1.) VME commissioned the survey because it knew potential buyers would be interested in such information and also because it wanted to establish a break point between what was on the property while VME was the owner and what might subsequently occur under someone else's ownership. (DFOF at ¶¶ 15–17.) The Versar report "identified several issues of environmental interest", including an area on the east parcel consisting of eight acres of "fill material" of unknown origin. (Bargren Aff., Ex. 4 at iii.) It was not known whether any hazardous substances were contained in the "fill material" and Versar recommended sampling the same "to establish whether or not the fill material poses a concern." (Id. at 24.) Such sampling was conducted as part of a "Phase II" environmental assessment by Versar, which was completed in October of 1992. (Bargren Aff., Ex. 5.) The Phase II report indicated the presence of polychlorinated biphenyls ("PCB's") in the fill material at levels of 42 parts-per-million ("ppm"). (Id. at 19–20.) This reading exceeded the minimum "action" level of 5–ppm established by the Wisconsin Department of Natural Resources ("WDNR"), but was below the federal benchmark of 50–ppm for purposes of declaring the waste "hazardous" under the Toxic Substances Control Act ("TCSA"). (Id.; DFOF at ¶ 63.) Versar indicated that the PCB reading had to be reported to the

---

1. Many of the facts are drawn from defendant's proposed findings of fact ("DFOF"). Those findings are deemed admitted because the plaintiff failed to respond as contemplated by Local Rule § 6.05. (See, Decision and Order dated February 22, 1996.)

WDNR and that the agency would require VME to formulate a "corrective action plan".[2] (Id.) Versar also stated that "the fill area poses a potentially significant environmental liability" and stated that "[a]dditional sampling and testing is necessary to evaluate the extent and nature of the fill material." (Id. at 22.) There was no indication in the report, however, that the contamination of the fill material posed any immediate threat to public health and safety or any other form of environmental emergency.

Consistent with the Phase II recommendation, Versar conducted a "Phase IIB" environmental assessment of the fill material. (Bargren Aff. Ex. 6.) That report confirmed that PCB's of 42–ppm, below the hazardous level of 50–ppm, were found in a "limited area" representing approximately 10% of the fill material. (Id. at 17–18; DFOF at ¶ 108.) Versar stated that "there are degrees of liability associated with the identified environmental concerns" at the Site, but concluded that "[a]t present, those liabilities cannot accurately be quantified." (Id. at 19.) Versar recommended that "VME should consider the need for quantifying the liabilities for in-house use." (Id.) Like the Phase II report, however, nothing in the Phase IIB report indicated the existence of an environmental emergency or an immediate threat to human health. (DFOF at ¶ 109.) In fact, no additional PCB testing was conducted until the early fall of 1993. (DFOF at ¶ 65.)

In January of 1993, the Giuffre Brothers submitted an offer to purchase the Property. (DFOF at ¶ 13.) As part of the deal, VME agreed to indemnify the Giuffres for remediation costs stemming from conditions disclosed in the Versar reports, as well as any other conditions identified by the WDNR or the Environmental Protection Agency ("EPA"). (DFOF at ¶ 14.) In May of 1993, Versar installed three monitoring wells and collected groundwater samples. (Bargren Aff., Ex. 28 at 2.) These samples "indicated

no detectable quantities for any analyte of concern identified in the fill material." (Id. at 2–3.) It was concluded "that the fill material has not impacted the groundwater within the natural soils beneath the fill. This is likely due to the clay layer identified in each of the three borings, acting as a barrier between the fill material and the groundwater and the relative immobile nature of PCB's." (Id. at 3.) On June 10, 1993, a meeting was held between VME, Versar and VME's legal counsel. (Id. at 1.) Pursuant to that meeting, Versar prepared a plan for additional investigation of the east parcel. (Id.) Versar stated that "[t]he purpose for future investigations will be to determine the approximate extent of PCB's above the State of Wisconsin cleanup guidelines (concentration of 5 ppm) and the extent PCB's above the 50 ppm." (Id.) There was no indication at that time that Versar now considered the matter to be an environmental emergency. Versar agreed, however, at VME's request, to expedite the additional testing, stating that "[a]lthough analytical results to date indicate the PCB's are confined and are not migrating, Versar understands VME Americas' desire to proceed as quickly as possible with the investigation ... so data may be reported to the WDNR, along with a proposed site remediation action plan." (Id.)

On September 13, 1993, the laboratory results of the additional testing were sent to VME and its legal counsel by Douglas Dahlberg ("Dahlberg"), the Versar employee supervising the environmental assessment. (Bargren Aff., Ex. 32; DFOF at ¶ 44.) These results showed one soil sample above the 50–ppm "hazardous" level; specifically, 98–ppm.[3] (Bargren Aff., Ex. 32 & Ex. 2 at 17–18.) This sample was isolated and located near the surface. (Bargren Aff., Ex. 2 at 22.) Dahlberg promised a "draft report" of the additional testing within a "couple of days". (Bargren Aff., Ex. 32.) Dahlberg subsequently sent a "draft" of the "Phase III"

2. By the time the formal Phase II report was issued (October, 1992), VME had already notified the WDNR of the contamination at the Site, both in a phone conversation on August 24, 1992 and in a follow-up letter dated September 1, 1992. (Edquist Aff., Ex. 22.)

3. The field testing kits actually showed five samples above the 50–ppm hazardous level. (Bargren Aff., Ex. 2 at 14.) Such field tests are subject to laboratory confirmation, however, and the lab results confirmed only one sample above the 50–ppm hazardous level. (Bargren Aff., Ex. 2 at 17; Dahlberg Dep. at 80–84.)

environmental assessment to VME and its legal counsel on September 22, 1993. (Bargren Aff., Ex. 2.) The "draft" confirmed the isolated nature of the 98–ppm reading, leading Versar to conclude that the contamination was caused by a surface release in the vicinity of the relevant sample. (Id. at 18.) It also stated that the 98–ppm reading was the only sample above the WDNR's 5–ppm "action" level. (Id.) As for groundwater, the draft report revealed the presence of clay and peat deposits under the entire fill area. (Id. at 13.) The report stated that "[t]he silty clay unit acts as a acquitard to the vertical movement of groundwater across the site. The peat unit also acts as a vertical confining unit for any migrating PCBs. PCBs are relatively immobile and are absorbed onto the surfaces of organic carbon found within peat."[4] (Id.; see also, DFOF at ¶ 35.) Based on this data, Versar discussed two possible cleanup options: (1) "onsite" or "in place" closure, which would contain—but not remove—the contaminated fill material; or (2) "if the final confirmation sampling in the vicinity of [the 98–ppm sample] indicates a very small area and depth is contaminated, removal of the contaminated material may be acceptable." (Id. at 21.) Versar recommended on-site containment. (Id. at 22; DFOF at ¶ 111.) Like the previous reports, nothing in the draft Phase III report discussed the existence of an environmental emergency or an immediate threat to human health. Rather, the containment recommendation, and other notable conclusions, were summarized as follows:

> Laboratory analytical results indicate contaminants in the fill are not present in groundwater and surface water. .
>
> Soil borings for monitoring wells and soil sampling, and test pit data indicate a clay layer of not less than 2.0 feet is beneath the entire fill area, limiting the potential flow into the underlying groundwater. The layer is performing as a natural clay liner for the fill area.

> Laboratory and field analysis of test pits, soil borings, and surface samples all indicate that the PCB contamination above the action limit of 5 ppm is isolated in the vicinity of B–10 and located near the surface.
>
> PCBs are relatively immobile and due to clay confining layer under the site, onsite containment should be considered.

(Id.)

On October 13, 1993, Dahlberg sent VME and its legal counsel a cost comparison of the two cleanup options. (Edquist Aff., Ex. 38.) Significantly, Dahlberg commented on the comparison as follows: "As we discussed, if the contaminants are in the upper 2 feet, removal is = 1/3 the cost of inplace closure, not considering long term monitoring." (Id.) Shortly thereafter, on October 21, 1993, VME decided to pursue the removal option. (DFOF at ¶ 84; Edquist Aff., Ex. 12.) The decision was based on the prior laboratory testing showing only one reading above the 50–ppm hazardous level and the earlier composite surface sampling showing readings of 42–ppm. (DFOF at ¶ 85; Edquist Aff., Dahlberg Dep. at 177–78.) VME also directed Versar to conduct additional sampling of the "hazardous" area to further define the extent of the contamination. (Edquist Aff., Ex. 12 at 2.) This additional sampling was done in late-October, 1993, and the results were available in early-to-mid November. (Id.) Those results, which showed even higher levels of PCB contamination in the contaminated area, were added to a modified and final Phase III report submitted by Versar in November of 1993. (Id.; Bargren Aff., Ex. 3.) The modified report referenced the same data contained in the September draft, plus the results of the additional sampling. (Bargren Aff., Ex. 3 at 13–22.) On all of the critical points of evaluation—such as the potential mobility of the PCBs, the threat to ground and surface water, the presence of the confining peat and clay liners, etc.—the final report was identical to the September draft report (Id. at 14, 16, 25; see also,

---

4. In addition to groundwater, the draft report discussed a "small percentage of precipitation onto the area of surface disturbance which enters into a perched subsurface system percolating through the fill and most likely begins to flow laterally at the base of the fill and in the peat horizon. Any PCBs which are mobile and enter the perched water flow regime will be quickly adsorbed [sic] by the organic carbon found in the peat horizon." (Id. at 16.)

DFOF at ¶¶ 113–119), save for one fundamental difference: Versar recommended excavation and removal of the soil instead of on-site containment.

PCBs are relatively immobile *and it appears that the cause of the contamination may have been a surface release, and as a result, an immediate removal of the contaminated soil should be considered as the remedial action.*

(Bargren Aff., Ex. 3 at 25; Dahlberg Dep. at 32–33; emphasis added; see also, DFOF at ¶ 112.)

Much has been made in this case of the use of the word "immediate" in the foregoing recommendation. The parties dispute whether and why the contaminated soil had to be removed immediately. There certainly was no pressure or direction from the WDNR to quickly remove the soil. (DFOF at ¶¶ 80, 94.) The Versar reports indicated there was little to no threat of PCB migration into the groundwater or surface water. (Bargren Aff., Ex. 2 at 13, 16, 22, Ex. 3 at 14, 16, 25; DFOF at ¶¶ 32–35, 81.) In fact, winter was approaching and it was unlikely that the PCBs would migrate at all during the winter freeze. (DFOF at ¶ 81.) The Versar reports did not discuss any immediate threat to human life or nearby wildlife. VME officials admit that, while they had a generalized fear of human exposure to the contaminated area or possible groundwater contamination, no one had identified a specific threat to human life or the groundwater requiring immediate action. (Bargren Aff., DeLong Dep. at 110–11, 166–71, Hill Dep. at 109–115; DFOF at ¶¶ 98–103.) Their fears were in the nature of a Murphy's Law, wherein they presumed that if something could go wrong it would, and so they felt it would be better, as an exercise of caution, to simply remove the contaminated soil and be done with it. (Bargren Aff., DeLong Dep. at 110–11, 151, 166–71.) VME was motivated by other reasons as well. For example, VME wanted to complete the real estate transaction with the Giuffres and the environmental cleanup was the final detail preventing that. (DFOF at ¶¶ 36, 40; Bargren Aff., DeLong Dep. at 110–11.) VME was also "anxious to get off the site" and to put

the matter "behind us", as the cleanup created an undesirable situation where both VME and the Giuffres were operating on the site and the lines of demarcation were blurred. (DFOF at ¶ 38; Bargren Aff., DeLong Dep. at 110–11.) Finally, VME wanted to put an "end" to its "involvement" with the property and its "potential liability" down the road; containment would require ongoing monitoring and security and ultimately could fail, leaving VME exposed to additional costs and claims. (DFOF at ¶¶ 37, 39, 89; Bargren Aff., DeLong Dep. at 151.)

The principal evidence that the matter presented an immediate threat to human life or the surrounding groundwater comes from the deposition of Douglas Dahlberg two years after he and Versar issued the final Phase III report. Dahlberg now claims that as soon as Versar received the sampling result showing a 98–ppm PCB contamination at the surface of the Property, he considered the matter an "emergency situation". (Bargren Aff., Dahlberg Dep. at 29, 74–81.) One of Dahlberg's alleged concerns was the water structure above the natural clay liner. (Id.) Dahlberg claims he was concerned that PCBs could migrate through this water structure vertically to the groundwater or horizontally to a nearby stream. (Id.) He claims he had this concern despite the fact that he did not know or determine how long the PCB's had been in the soil, how fast the PCB's were migrating (if at all), or if there even were PCB's in the upper water structure. (Id. at 79–80, 93–95; see also, DFOF at ¶¶ 67–68.) He also claims he had this concern despite the fact that Versar's testing showed no evidence of downward migration, no evidence of PCB's in the groundwater, and no evidence of PCB's in the nearby stream. (Id. at 79–80, 84, 94–95; DFOF at ¶¶ 32–33.) A second alleged concern was the unsecured nature of the Property and the risk of exposure this posed to the food chain, either through wildlife eating or drinking in the contaminated area or walking across the contaminated area and carrying contaminated soil to other locations. (Id. at 96–99.) He admits, however, that he never recommended securing the site through fencing and warning signs. (Id. at 96–102; see also, DFOF at ¶¶ 43, 70–72, 104–105.) In fact, Dahlberg

never recommended taking any steps to warn the public of the perceived "emergency". (Id.)

In any event, VME's legal counsel contacted the WDNR and received oral authorization, over the phone, to proceed with the removal of the contaminated soil. (Bargren Aff., Ex. 33 at 2.) Counsel confirmed that authorization in a letter dated December 2, 1993. (Id.) The removal activities commenced in December of 1993 and were substantially concluded on or before June of 1994. (Bargren Aff., Ex. 16.) No public hearings were ever held concerning the removal or the contamination in general, nor were any public notices issued concerning the same. (DFOF at ¶¶ 27, 49, 59, 96.) Neither VME nor Versar created any repository of information about the project which the public could inspect and evaluate. (DFOF at ¶¶ 27, 60, 79, 95.) VME never designated a public spokesman to deal with any concerns the community might have about the project. (DFOF at ¶ 29.) No effort of any type was made to solicit input or concerns from the people or businesses in the area around the Site. (DFOF at ¶¶ 28, 60, 95–96.) In essence, VME and Versar chose and carried out its preferred method of cleaning up the Property on its own schedule, without consulting the public, and with little supervision or involvement of the WDNR. It now seeks to be reimbursed for those activities by Hein–Werner, who is allegedly responsible for the contamination at issue.

## LAW

### I. SUMMARY JUDGMENT

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. at 2555. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dis-

missed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company,* 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. Nor may "[a] party to a lawsuit ... ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge,....'" *Palucki,* 879 F.2d at 1572 (7th Cir.1989). Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

## II. RESPONSE COSTS AND THE NCP

■ VME seeks recovery of the response costs it incurred to investigate, remove and dispose of the contaminated soil on the Property. The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") creates a private right of action for parties seeking the recovery of costs incurred in responding to certain environmental hazards. 42 U.S.C. § 9607(a). To prevail in a claim under § 9607(a), a plaintiff must prove the following: (1) the defendant is a "covered person" within the meaning of CERCLA; (2) a "release" or "threatened release" of any "hazardous substance" from the site in question has occurred; (3) the release or threatened release caused plaintiff to incur costs; (4) plaintiff's costs are "necessary" costs of response; and (5) plaintiff's response actions were consistent with the National Contingency Plan. *Greene v. Product Manufacturing Corp.,* 842 F.Supp. 1321,

1323 (D.Kan.1993). It is the last requirement, dealing with the National Contingency Plan, which Hein–Werner challenges through the instant motion.

The National Contingency Plan ("NCP") "is a series of regulations promulgated by the Environmental Protection Agency. The regulations establish criteria and provide guidance for site evaluation and cost effectiveness, planning of cleanup actions, and consideration of alternative remedial options." *Pierson Sand & Gravel, Inc. v. Pierson Township,* 851 F.Supp. 850, 855–56 (W.D.Mich.1994), *aff'd,* 1996 WL 338624 (6th Cir.1996). The first version of the NCP became effective in 1985. 40 C.F.R. Part 300 (1988). A substantial revision of the NCP took effect on April 9, 1990, which applies to costs incurred on or after that date. 55 Fed.Reg. 8666 (March 8, 1990). The two versions of the NCP are accompanied by different compliance standards. The original version of the NCP required strict compliance of persons seeking recovery for response costs. 40 C.F.R. § 300.71 (1988). Following the 1990 revision of the NCP, parties seeking recovery were required to show only that they had substantially complied with the terms of the NCP. 40 C.F.R. § 300.700(c)(3)(i). "Immaterial" or "insubstantial" deviations from the NCP will no longer render a response action inconsistent with the NCP. 40 C.F.R. § 300.700(c)(4).

## III. SUBSTANTIAL COMPLIANCE

■ Much is made in this case concerning whether the cleanup of the Site conducted by VME qualifies as a "removal" action or a "remedial" action under CERCLA. "The division of CERCLA responses into the two categories of removal and remedial actions is found in the statute itself, repeated throughout the regulations, and figures prominently in judicial analysis of consistency with the NCP." *Channel Master Satellite, Systems v. JFD Electronics Corp.,* 748 F.Supp. 373, 385 (E.D.N.C.1990). "The courts have consistently found that the removal category was to be used in that limited set of circumstances involving a need for rapid action, while non-urgent situations are to be addressed as remedial actions." *Id.* In *Am-*

land Properties Corp. v. Aluminum Company of America, 711 F.Supp. 784, 795 (D.N.J. 1989), the court described the distinction as follows:

> Removal actions are to be taken in response to an immediate threat to the public welfare or to the environment, ... and are "primarily ... intended for the short-term abatement of toxic waste hazards." ... Remedial actions, on the other hand, "are generally considered long-term or permanent remedies." ... The distinction between these actions is of no small importance, for whereas removal actions need only comply with the relatively simple NCP requirements set forth at 40 C.F.R. § 300.65 ... [now 300.415], remedial actions must comport with the "more detailed procedural and substantive provisions of the NCP" as set forth at 40 C.F.R. § 300.68 [now 300.435].

The determination of whether an action is a removal action or a remedial action is a question of law, Gussin Enterprises, Inc. v. Rockola, 1993 WL 114643, *3 (N.D.Ill.1993), and while the record is sufficiently developed for the Court to rule on the matter, such a ruling is unnecessary. It is undisputed that VME provided no public notice and no opportunity for public comment at any point during its response activities, and "[n]otice to the public and opportunity to comment must be provided regardless of whether a removal or remedial action is performed." G.J. Leasing Co., Inc. v. Union Electric Co., 854 F.Supp. 539, 566 (S.D.Ill.1994), aff'd, 54 F.3d 379 (7th Cir.1995).

This was not always the case. Under the 1985 NCP, there was no requirement for public notice and comment before a private party could undertake a removal action. Con–Tech Sales Defined Benefit Trust v. Cockerham, 1991 WL 209791, *8 (E.D.Pa. 1991). The 1990 NCP changed this. The 1990 NCP states that "[p]rivate parties un-

dertaking response actions should provide an opportunity for public comment concerning the selection of the response action...." 40 C.F.R. § 300.700(c)(6). It also references certain "community relations" requirements applicable to removal actions, which were also created by the 1990 NCP. 40 C.F.R. § 300.700(c)(6)(ii). These requirements compel a private party undertaking a removal action to designate a "spokesperson" who shall "inform the community of actions taken, respond to inquiries, and provide information concerning the release." 40 C.F.R. § 300.415(n)(1); see also, Alcan–Toyo America, Inc. v. Northern Illinois Gas Co., 904 F.Supp. 833, 836 (N.D.Ill.1955).[5] "The spokesperson shall notify, at a minimum, immediately affected citizens, state and local officials, and, when appropriate, civil defense or emergency management agencies." Id. It is undisputed that VME provided no opportunity for public comment concerning the selection of its response action. It did not designate a spokesperson, it did not inform the community of the actions taken, it did not respond to community inquiries, and it did not provide the community with information concerning the release. VME did not even notify "immediately affected citizens", nor is there any evidence that VME or Versar attempted to determine whether any specific citizens were "immediately affected". VME simply took no efforts whatsoever to notify the surrounding community of this alleged environmental "emergency".

Numerous federal courts, in both removal and remedial actions, have ruled that the failure to provide public notice and an opportunity for public comment constitutes a substantial and material departure from the NCP, rendering a response action inconsistent therewith and barring the recovery of response costs. See, County Line Investment Co. v. Tinney, 933 F.2d 1508, 1514–15

---

5. Actually, the NCP speaks in terms of "the lead agency" designating a spokesperson who gives notice to the public and addresses their concerns. 40 C.F.R. § 300.415(n)(1). However, "[t]he term 'lead agency' is often used in the regulations to denote the governmental entity which is performing a cleanup. In private party response actions, no governmental action is necessary, and the actions to be taken by the 'lead

agency' become those to be taken by the private party." Channel Master Satellite, Systems, Inc. v. JFD Electronics Corp., 748 F.Supp. 373, 382, n. 11 (E.D.N.C.1990). See also, Alcan–Toyo America, Inc. v. Northern Illinois Gas Co., 904 F.Supp. 833, 836 (N.D.Ill.1995) (stating that actions designated to be taken by a "lead agency" are to be taken by the private party carrying out the response action, citing 40 C.F.R. § 300.700(c)(8)).

(10th Cir.1991); *G.J. Leasing,* 854 F.Supp. at 566, *aff'd,* 54 F.3d 379 (7th Cir.1995); *Channel Master,* 748 F.Supp. at 389–90; *Amland,* 711 F.Supp. at 801; *Pierson Sand,* 851 F.Supp. at 855–56, *aff'd,* 1996 WL 338624 (6th Cir.1996); *Sherwin–Williams Co. v. City of Hamtramck,* 840 F.Supp. 470, 476–77 (E.D.Mich.1993); *Con–Tech,* 1991 WL 209791 at *8–9, fns. 8, 11; *Alcan–Toyo,* 904 F.Supp. at 836–37. The preamble to the 1990 NCP itself emphasizes the central importance of the public comment requirement:

> Public participation is an important component of a CERCLA-quality cleanup, and of consistency with the NCP. The public—both PRP's [potentially responsible parties] and concerned citizens—have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups—which are performed without governmental supervision—are carried out in an environmentally sound manner. Thus, EPA has decided that providing public participation opportunities should be a condition for cost recovery under CERCLA.

55 Fed.Reg. 8795 (March 8, 1990); *see also, Pierson Sand,* 851 F.Supp. at 856; *Alcan–Toyo,* 904 F.Supp. at 836–37. The NCP expressly requires public comment in removal actions (40 C.F.R. § 300.415(n)), and then twice reiterates this requirement in connection with a cost recovery action for removal costs (40 C.F.R. §§ 300.700(c)(5)(vi) & 300.700(c)(6)(ii)). As the Court stated in *Alcan–Toyo,* these multiple references to the need for public participation highlights the material nature of the requirement:

> Public comment is clearly required under 40 C.F.R. § 300.415(m). This section, excluding a few inapplicable provisions, is listed as a requirement with which parties must substantially comply in order to recover their costs. See 40 C.F.R. § 300.700(c)(5)(vi). Under the provision rendering the section governing removal actions necessary for substantial compliance, therefore, the public comment requirement for removal actions is prescribed for cost recovery actions. The EPA, however, has created an additional separate section, explicitly reiterating the requirement that to be consistent with the NCP the party must seek public comment. The fact that the NCP lists the public comment requirement in two separate subsections of the requirements for consistency with the NCP indicates that a failure to fulfill the requirement is not an "immaterial or insubstantial deviation[ ]" from the NCP's requirements. 40 C.F.R. § 300.700(c)(4). . . .

> Alcan–Toyo may not claim it substantially complied with the NCP when it completely failed to even recognize one of its important requirements. . . . Here Alcan–Toyo did nothing to obtain public input and therefore has not substantially complied with the NCP.

*Alcan–Toyo,* 904 F.Supp. at 836–37.

VME argues, however, that the upcoming freeze rendered public involvement impractical, and further suggests that its contacts with the WDNR constituted an acceptable substitute for such involvement. As for the upcoming freeze, the argument backfires. It is undisputed that whatever mobility the PCB's may have had during warmer temperatures (which appears to be little), the PCB's would have been frozen in place during the winter months, presenting no reasonable threat of migration. Therefore, the upcoming freeze actually presented an opportunity for public involvement, not an obstacle thereto. As for VME's limited contacts with the WDNR, most courts have rejected the argument that such contacts work as a substitute for public participation. *Sherwin–Williams,* 840 F.Supp. at 477; *Channel Master,* 748 F.Supp. at 389–90; *Amland,* 711 F.Supp. at 801. As stated in *Sherwin–Williams,* public comment means public comment:

> The court finds, however, that state regulatory involvement in the remedial process is not a substitute for the public comment contemplated by section 300.700(c)(6). Public comment means just that, public comment. Negotiations between the City and MDNR officials do not constitute the public comment contemplated by the CERCLA regulations. . . .

> The regulations clearly contemplate participation by the general public in decisions

that could affect the environmental conditions of their neighborhood. Using state regulators as a substitute for the "public" is contrary to the letter and the spirit of the regulations.

*Sherwin–Williams,* 840 F.Supp. at 477; *see also, Pierson Sand,* 1996 WL 338624 at *5 ("While governmental supervision of a cleanup may provide some of the same guarantees as a cleanup subject to public comment and criticism, the NCP does not allow this type of substitution.").

Some courts have found state regulatory involvement to be an effective substitute for public comment, *see generally, General Electric Co. v. Litton Business Systems, Inc.,* 715 F.Supp. 949 (W.D.Mo.1989), *American Color & Chemical Corp. v. Tenneco Polymers, Inc.,* 918 F.Supp. 945 (D.S.C.1995), but only where the state agency "is actively involved in all aspects of the investigation, planning, and remediation of a release of a hazardous substance...." *American Color,* 918 F.Supp. at 956–57. In *General Electric,* for example, the cleanup was discussed in at least three public meetings of the state agency involved, for which public notice was given, and which members of the public attended. *Channel Master,* 748 F.Supp. at 390; *Sherwin–Williams,* 840 F.Supp. at 477. Moreover, the plaintiff in that case discussed and evaluated a wide range of possible remedial actions with state officials. *Sherwin–Williams,* 840 F.Supp. at 477. In *American Color,* the state agency, using 37 different staff persons and 14 different agency divisions, conducted its own assessments, testing, and studies of the affected areas, was "closely involved" in the preliminary investigations of PCB contamination, approved the hiring of a contractor used to investigate the matter and reviewed and approved the contractor's work, summoned the parties to meetings concerning the necessary action to be taken at the site, negotiated three consent orders which governed the ultimate cleanup of the site, and was otherwise heavily involved in all aspects of the remediation. *American Color,* 918 F.Supp. at 949–55.

Here, nothing approaches the "active involvement" of the state agencies involved in *General Electric* and *American Color.* The record reflects, at most, that VME gave the WDNR verbal and written notice of the problem and copies of the Phase II and Phase IIB Environmental Assessments. (Bargren Aff., Ex. 33.) In response to the initial notice, the WDNR issued a standard response detailing VME's legal responsibilities. (Id.; *see also,* Bargren Aff., Ex. 27.) There is no indication that the WDNR responded at all to the environmental assessments. Finally, in response to VME's hasty request to proceed with the removal, the WDNR gave its verbal approval over the phone. (Bargren Aff., Ex. 33.) That was the extent of the WDNR's involvement. It did not conduct any public hearings on the matter, it did not negotiate and issue consent orders, it did not conduct its own investigation of the Site, it was not closely involved in monitoring or reviewing Versar's investigation, and it was not closely involved in evaluating possible remedial actions. Under these circumstances, the WDNR's involvement is not an adequate substitute for public comment and participation. Because VME failed to substantially comply with the requirement of public notice and comment, it cannot recover response costs under CERCLA.

VME will no doubt be frustrated by this result, and understandably so. VME acted responsibly throughout this cleanup. It discovered a problem on the property that was not of its own making. It immediately reported the problem to the authorities, investigated the extent of the contamination, and then took responsibility for cleaning it up. Moreover, all the evidence indicates that VME chose the most cost-effective solution to the problem and, more importantly, one that worked. On such a record, it seems a bit unfair for Hein–Werner, the likely source of the contamination, to escape much of the financial responsibility for cleaning it up. But that is what the law requires. Compliance with the NCP "is [not] reducible to an inquiry into whether the cleanup was cost-efficient and environmentally sound." *Channel Master,* 748 F.Supp. at 384, quoting *Amland,* 711 F.Supp. at 796. Congress chose instead to create a detailed regulatory scheme and decided to make "adherence to the regulatory scheme ... more important than making CERCLA an unlimited vehicle

for cleanup cost recovery." *Channel Master,* 748 F.Supp. at 393. In cases like this, the regulatory scheme may seem unduly scrupulous and inflexible, but this highlights the limited nature of the federal remedy:

I am aware the result in this case presents a superficial anomaly: the County, responsible for a release of hazardous substances that causes Artesian to suffer significant economic losses, nevertheless is not required to pay full compensation. This outcome, however, amply demonstrates the difference between an action for response costs under CERCLA and an action for damages in tort.... Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions. Unless Congress sees fit to provide such a remedy, full compensation for hazardous waste harms will in most instances remain the province of state law.

\*      \*      \*      \*      \*      \*

Plaintiff argues that the NCP should not be considered a kind of "regulatory obstacle course—an inflexible series of procedural requirements, each of which must be satisfied before a party conducting a CERCLA cleanup can recover its costs from those responsible for the contamination." The court does not regard the NCP as such. The court simply believes that, since plaintiff seeks recovery under the CERCLA statute, plaintiff is required to comply with the specific requirements of that statutory claim, as set forth in the regulations and caselaw.

*Channel Master,* 748 F.Supp. at 394, quoting *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1299–1300 (D.Del.1987). VME has pled various state law claims which will survive the Court's decision today. VME can pursue those claims despite its failure to involve the public in the matter. But Congress and the bureaucracy deems public involvement critical to recovery under CERCLA, and the Court is duty bound to enforce their intentions in this regard.

## IV. PRELIMINARY INVESTIGATION AND MONITORING COSTS

Several "[c]ourts have held that initial preliminary investigatory and monitoring costs are recoverable irrespective of the recoverability of other response costs or compliance with the requirements of the [NCP]." *Gache v. Town of Harrison,* 813 F.Supp. 1037, 1046 (S.D.N.Y.1993); *see also, Pierson Sand & Gravel, Inc. v. Pierson Township,* 1996 WL 338624, \*5–6 (6th Cir.1996); *Carlyle Piermont Corp. v. Federal Paper Board Co., Inc.,* 742 F.Supp. 814, 821–22 (S.D.N.Y. 1990); *Marriott Corp. v. Simkins Industries, Inc.,* 825 F.Supp. 1575, 1583 (S.D.Fla.1993); *City of New York v. Chemical Waste Disposal Corp.,* 836 F.Supp. 968, 980 (E.D.N.Y. 1993); *Amland,* 711 F.Supp. at 795–96. Such costs do not, however, include investigatory costs incurred prior to the discovery of the contamination at issue. *Amland,* 711 F.Supp. at 795–96. Nor do they include investigatory costs incurred after a cleanup has already begun, because such costs could not be considered "initial" or "preliminary" in nature. *Pierson Sand,* 1996 WL 338624 at \*6. Here, the Phase I and Phase II investigations and reports were conducted prior to VME's discovery of PCB's on the Property and for purposes of compiling information for a potential buyer. Thus, VME may not recover these costs in a CERCLA action. The Phase IIB investigation and report however, was conducted after discovery of the contamination and in an effort to determine the extent of the contamination. The three monitoring wells were installed and subsequent groundwater testing conducted in an effort to determine the extent of the contamination. Finally, additional testing was conducted after the Phase IIB report and resulted in the draft Phase III report, also in an effort to determine the extent of the contamination. Thus, VME may recover these costs in a CERCLA action. On October 21, 1993—after the draft Phase III report and based on the data contained therein—VME decided to conduct a removal action. The Court concludes that any investigatory activities subsequent to this date can no longer be considered "initial" or "preliminary" activities, as VME had already compiled sufficient information to make a choice as to the appropri-

ate response. Thus, VME cannot recover the costs of any testing or reports conducted or compiled after October 21, 1993.

## V. DECLARATORY RELIEF

■ VME also seeks declaratory relief under CERCLA with respect to alleged contamination having nothing to do with the PCB contamination of the east parcel. VME alleges that the WDNR has notified it and Hein–Werner of "hundreds" of 55–gallon drums buried on the northern parcel of the Site. VME alleges the drums were placed there by Hein–Werner and wants a declaration that Hein–Werner is responsible for cleaning up that portion of the Site. While courts have authority to issue declaratory judgments with respect to a defendant's liability for response costs under CERCLA, it appears such authority is limited to situations where the plaintiff has incurred some minimal level of expense associated with the alleged contamination, such as assessment or monitoring costs. *See, Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467, 475–76 (D.N.J.1992). While VME has incurred costs associated with the PCB contamination, there is no evidence that VME has incurred any costs in connection with the alleged barrels on the northern portion of the Site. Thus, any claim for declaratory relief regarding the northern portion of the property is premature and will be dismissed without prejudice.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Hein–Werner's motion for summary judgment on the CERCLA claims is granted-in-part and denied-in-part. All CERCLA claims are hereby dismissed, except those claims relating to the investigatory costs approved by the Court. Count III, seeking declaratory relief, is dismissed without prejudice.

**SO ORDERED.**